UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID REEDY,

                    Plaintiff,           Civil Action No.: 16-13876
                                         Honorable Bernard A. Friedman
v.                                       Magistrate Judge Elizabeth A. Stafford

MICHAEL WEST,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION TO DENY DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT [ECF NO. 61]**

## I.  Introduction

Plaintiff David Reedy, a prisoner, sues Defendant Michael West

under 42 U.S.C. § 1983, alleging that West violated his Eighth Amendment

rights by failing to protect him from being assaulted.  [ECF No. 1].[1]  West

moves for summary judgment, and Reedy responds.  [ECF No. 61; ECF

No. 62].  The Honorable Bernard A. Friedman referred all pretrial

proceedings to the undersigned under 28 U.S.C. § 636(b).  [ECF No. 16].

The Court **RECOMMENDS** that West's motion for summary judgment be

**DENIED**.

---

[1] West is the only remaining defendant after the other defendants were
dismissed by stipulation and order.  [ECF No. 60].

## II.  Background

In 2016, Reedy was housed at the Michigan Department of Corrections (MDOC) Gus Harrison Correctional Facility and West was a counselor at the facility.  In March of that year, Reedy and Oscar Hensley were placed in the same cell, and their relationship became fraught with racial tension and other issues.  [ECF No. 61-1, PageID.395; ECF No. 61-5].[2]

On July 20, 2016, when the Reedy and Hensley were in their cell, Hensley hit Reedy in his head with a rock and caused him serious injuries. [ECF No. 1, PageID.3; ECF No. 61-3, PageID.417; ECF No. 61-4, PageID.423].  Reedy was taken to MDOC Health Care for evaluation and treated for "contusions to the head and neck and a large laceration to his head."  [ECF No. 61-4, PageID.425].  While being treated, Reedy began "seizing and fell to the floor."  [*Id.*].  He was then transported to the Bixby Hospital via ambulance and later to the University of Michigan Emergency Department by helicopter.  [*Id.*].  Reedy was diagnosed with a traumatic brain injury.  [ECF No. 65, PageID.560].

---

[2] West included no index of exhibits, as required by the Court's Electronic Filing Policies and Procedures, R18.  He also failed to include on the docket sheet any exhibit identifiers (*e.g.*, "Exhibit A") or descriptions (*e.g.*, "Reedy's deposition").

Reedy had feared Hensley's attack before it happened.  Reedy says that near the end of June 2016, Hensley told him "that either one of us [is] going to have to go or [I am] going to do something about it."  [ECF No. 62, PageID.462].  Reedy complains that, during the months preceding the attack, he repeatedly requested a cell change because Hensley became "increasingly menacing and hostile toward [him]"—"I literally begged to be moved for fear that my cell-mate would act on his threats."  [ECF No. 1, PageID.3, 9].

Reedy made no written request for protection or a cell change.  [ECF No. 61-1, PageID.392-393].  But it is undisputed that Reedy and Hensley asked West to separate them the morning before the assault.  [ECF No. 61, PageID.365; ECF No. 62, PageID.463].  The parties agree that Hensley told West, "[I]f y'all don't move this mutherfucker ya'll going to be responsible for what happens."  [ECF No. 61-2, PageID.408; ECF No. 61, PageID.365].  West responded, "You guys are two grown, you know, adults here.  You guys should be able to get this figured out."  [ECF No. 62-6, PageID.514; *see also* ECF No. 61-2, PageID.408].

Other facts are in dispute, including the number of times Reedy spoke with West, and what the parties and Hensley said.  According to Reedy, he spoke with West twice.  First, he asserts that he told West a

3

week before the attack that Hensley threatened him and that they needed to be moved to different cells.  [ECF No. 61-1, PageID.386].  Reedy testified that West told him "he'd get back with [him]," but never did.  [*Id.*, PageID.387].

Reedy says that he spoke to West a second time about Hensley's threats the morning before the attack.  That morning, Reedy and Hensley both went to West's office about the need for them to be separated, with Hensley stepping in to speak with West first.  [ECF No. 61-1, PageId.387].  Reedy claims that when Hensley was exiting West's office, he heard West tell Hensley to "do what you got to do."  [*Id.*].  Reedy says that he then spoke to West, and that West instructed him to warn Hensley that West would move Hensley "so far up north" if he hit Reedy.  [ECF No. 62-3, PageID.487-488, 499].  Reedy testified he reiterated his fear for his safety, but West responded, "[A]ww, he ain't going to do nothing."  [ECF No. 62-3, PageID.499].

Reedy's fear stemmed in part from the fact that he is five inches shorter and about 30 pounds lighter than Hensley, and Hensley lifted weights so that "he was bulked out some."  [ECF No. 62-3, PageID.496].

West claims that he only spoke to Reedy once about Hensley's threat—when he spoke to the two inmates the day before the assault.

4

[ECF No. 61-2, PageID.405-406].  According to West, Hensley said he wanted to be moved because Reedy slammed their cell door.  [ECF No. 61-5, PageID.444].  West also claims that Reedy returned to his office a short time later to say that he and Hensley talked and "everything was good."  [ECF No. 61-2, PageID.406].  When West was asked in his deposition about Hensley telling him that he would "do what I gotta do," West responded that prisoners "will say anything that they need [ ] to get a cell move."  [*Id.*, PageID.407].

When Michigan State Police and MDOC officials investigated the assault, they interviewed Hensley and Reed.  Hensley "admitted to obtaining, storing and then using the rock" to assault Reedy.  [ECF No. 61-4, PageID.437; ECF No. 61-5, PageID.439-452].  Hensley told the investigating officers that he and Reedy went to their counselor, West, "on separate occasions to be moved over a week ago" because they "did not get along," but West "refused to move them" and told them to "work it out." [ECF No. 61-4, PageID.437; ECF No. 61-5, PageID.440].  Hensley told the investigators, "'You see the results,' 'I tried to go other avenues,' 'They put me in that position,' and 'A person can only take so much.'"  [ECF No. 61-4, PageID.437; ECF No. 61-5, PageID.441].[3]

---

[3] Reedy filed grievances with the MDOC after his assault.  [ECF No. 1,

Hensley was charged with and pleaded guilty to assault with intent to do great bodily harm.  [ECF No. 61-3, PageID.417].  West does not dispute that Reedy sustained serious injuries.  [ECF No. 61, PageID.373 n.3].  Instead, West argues that there is insufficient evidence for a jury to find that he violated the Eighth Amendment and that he is entitled to qualified immunity.

## III.  Analysis

### A.

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At the summary judgment stage, the Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify portions of the record that show the absence of a genuine dispute as to any material

---

PageID.9-12].  The MDOC rejected Reedy's Step I grievance as being duplicative, and the decision was upheld through his Step III grievance. [ECF No. 1, PageID.8-12; *see also* ECF No. 15-3].

6

fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the movant satisfies this burden, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts showing a genuine issue for trial.  *Id.* at 324.  The Court must view the factual evidence in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Reedy alleges that West violated his rights under the Eighth Amendment.  That amendment imposes a duty on prison officials to provide humane conditions, including by taking reasonable measures to protect inmates from violence from other inmates.  *Farmer v. Brennan*, 511 U.S. 825, 832-834 (1994) (collecting cases).  To show a violation of the Eighth Amendment arising from a failure to protect, a prisoner must satisfy an objective and a subjective component.

### 1.  Objective Component

The objective component requires that the prisoner show "that the failure to protect from risk of harm is objectively 'sufficiently serious,'" meaning that "'he is incarcerated under conditions posing a substantial risk of serious harm.'"  *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (quoting *Farmer*, 511 U.S. at 833).  In *Bishop*, the plaintiff raised an issue of fact because he was young, small and lacked full mental functioning, and

7

he was placed in a cell with an older, stronger and predatory inmate.  *Id.*
These circumstances would place a reasonable officer on notice that the
plaintiff required close supervision, and "raised an issue of fact as to
whether the failure to protect [the plaintiff] from risk of harm was sufficiently
serious."  *Id.*

West claims that the facts here would not have placed a reasonable
corrections officer on notice that there was a substantial risk to Reedy's
safety.  [ECF No. 61, PageID.372-375].  First, West emphasizes that
Reedy never explained "*how*" Hensley threatened him.  [*Id.*, PageID.374
(emphasis in original)].  According to West, Reedy's unparticularized and
vague fear did not put him on notice that there was a substantial risk of
serious harm.  [*Id.*, PageID.373-374].  Second, West suggests that
Hensley's threats were not serious because Hensley's complaint was about
Reedy slamming the door.  [*Id.*, PageID.375].

For West's argument that Reedy fails to present enough evidence to
meet the objective component, the Court must view the evidence in a light
most favorable to Reedy.  *See Bishop*, 636 F.3d at 766.  When viewing the
evidence in a light most favorable to Reedy, the Court finds that Reedy
easily meets the objective component.

To make this finding, the Court relies on Reedy's testimony that he

8

begged West to move him a week before the attack because of Hensley's threatening statements.  [ECF No. 61-1, PageID.386].  Hensley likewise told investigators that he warned West a week before the attack that he and Reedy needed to be separated.  [ECF No. 61-5, PageID.440].  It is also undisputed that both Reedy and Hensley spoke to West the day before the attack.  West admits that Reedy and Hensley both requested a room change, and that Hensley told West, "You guys got to move this motherfucker out of my cell" and "y'all going to be responsible for what happens."  [ECF No. 61, PageID.375].

Of further import, Reedy testified that his fear of Hensley stemmed in part from the fact that he is five inches shorter and about 30 pounds lighter than Hensley.  [ECF No. 62-3, PageID.496].  MDOC record corroborate that Hensley was 6'1" tall and weighed 198 pounds, while Reedy is 5'8" tall and weighed 160 pounds.  [ECF No. 62-2, PageID.484-485].  This size discrepancy, coupled with Hensley's threats, "raise[ ] an issue of fact as to whether the failure to protect [Reedy] from risk of harm was sufficiently serious."  *Bishop*, 636 F.3d at 766.

The Court rejects West's argument that he knew only of a "'vague, general fear of harm not based on a specific threat.'"  [ECF No. 61, PageID.374 (quoting *Beasley v. Stephens*, No. CIV. 10-895-GPM, 2011

9

WL 2670189 (S.D. Ill. July 7, 2011)].  A reasonable jury could find that Hensley's warning to West that he would be "responsible for what happens" was an unmistakable threat to Reedy's safety.

## 2. *Subjective Component*

To satisfy the subjective component, the plaintiff must show that the prison official was deliberately indifferent to the plaintiff's health and safety. *Farmer*, 511 U.S. at 839-40.  The test for deliberate indifference does not require "that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Id.* at 842.  Deliberate indifference can be shown with circumstantial evidence, "and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Id.*  When prison officials are aware that a prisoner is vulnerable to assault, the officials must protect that prisoner.  *Bishop*, 636 F.3d at 767 ("We have recognized that a prison official may be held to be deliberately indifferent to a substantial risk to inmate safety if he is aware that an inmate is vulnerable to assault and fails to protect him.").

As noted, in *Bishop*, the plaintiff was vulnerable to assault because of his youth, small size and impaired mental functioning, and because he was

10

placed in a cell with an older, stronger and predatory inmate.  *Id.* at 766.

The plaintiff testified that he complained to corrections officials that his

cellmate was sexually assaulting him, but he could not specify to whom he

made those complaints.  *Id.* at 768-69.  Even so, the court found that the

plaintiff had enough evidence against one of the officials (Stanley), for two

reasons.

> First, Bishop has raised an issue of fact as to Stanley's
> knowledge of a risk to his safety because of Bishop's status as
> a vulnerable inmate and Floyd's status as a predatory inmate.
> Bishop defeats Stanley's summary judgment motion because
> he points to evidence from which a finder of fact could conclude
> that Stanley was aware that Bishop's vulnerability made his
> placement in the Mental Health Step–Down Unit with more
> aggressive inmates such as Floyd a substantial risk to Bishop's
> safety.  Bishop presents evidence from which a fact-finder
> could conclude that Stanley was aware of Bishop's
> characteristics, and aware that prisoners with these
> characteristics are vulnerable to attack.

*Id.* at 771.  Second, Stanley spent most of his day in close proximity to the

inmates and could hear what inmates said.  *Id.* at 772.  "Stanley

acknowledged that if Floyd had been aggressing on other inmates as

alleged by Bishop, then he would have been aware of the situation."  *Id.*

Here, West argues that there is not enough evidence for Reedy to

satisfy the subjective component because he (West) never concluded that

Reedy needed protection or that there was an imminent threat on Reedy's

life.  [ECF No. 61, PageID.376].  West asserts that neither Hensley nor

Reedy were on West's normal caseload; that he did not know why Hensley had transferred into the same housing unit as Reedy; that Reedy did not tell West "*how* Hensley threatened him"; and that Hensley said that he wanted to move only because Reedy slammed the cell door.  [*Id.*, PageID.377 (emphasis in original)].  West also relies on his own experience that prisoners say anything to get a cell move, on his testimony that Reedy told him that "everything was good" the morning before the attack, and on Reedy's failure to request protection from Hensley in writing.  [*Id.*, PageID.377-378].  These arguments lack merit.

First, the deliberate indifference test does not require that the official admit to being aware that a substantial risk to inmate safety existed.  Nor does it require that the official have a special relationship with the prisoner, such as the prisoner being on the official's caseload.  Instead, the jury may rely on circumstantial evidence and find liable any prison official who "knew of a substantial risk from the very fact that the risk was obvious."  *Farmer*, 511 U.S. at 842.

West's duty to protect Reedy did not require that West know *how* Hensley would assault Reedy.  A prison official has a duty to protect a prisoner who the officials knows is vulnerable to assault.  *Bishop*, 636 F.3d at 767.  The jury here could find that West knew that Reedy was vulnerable

to assault because, as West admits, both Reedy and Hensley told West about Hensley's threat, and Hensley said that West would be responsible for what happened if Hensley and Reedy were not separated.

The Court cannot rely on West's testimony that Reedy told him that "everything was good" to grant summary judgment. [ECF No. 61-2, PageID.406]. As noted, the Court must view the evidence in the light most favorable to Reedy. *Scott*, 550 U.S. at 380. Contrary to West's testimony, Reedy testified that he remained in fear after his and Hensley's meeting with West, but that West responded that Hensley would not do anything. [ECF No. 62-3, PageID.499]. Hensley's statements to the investigators corroborate Reedy's claim that the danger did not dissipate after the inmates' meeting with West. Hensley asserted that West put him in the position of having to assault Reedy because West refused to separate them. [ECF No. 61-4, PageID.437; ECF No. 61-5, PageID.441].

And while West dismissed Hensley's threat to "do what I gotta do" because prisoners "will say anything that they need [ ] to get a cell move," [ECF No. 61-2, PageID.407], the jury may find West's dismissive response to be evidence of deliberate indifference. West does not elaborate on what motive Hensley might have had for wanting to move other than his hostile relationship with Reedy. In fact, West said that he did not know anything

13

about Hensley and Reedy, [*id.*], so a reasonable jury may find that West had an insufficient basis for assuming that Hensley would lie about his intention to assault Reedy.

A reasonable factfinder may conclude that, instead of dismissing the seriousness of Hensley's threat, West had a duty to protect Reedy and to investigate the threat.  Under MDOC Policy Directive 05.01.140, ¶ T, when a staff member believes that a prisoner may need protection, or when a prisoner requests protection, the prisoner "shall be placed in temporary segregation . . . or suitable housing" to protect the prisoner pending an "immediate" investigation.  [ECF No. 62-12, PageID.543].  West admits that this policy does not require the complaining inmate "to put [the protection request] in writing themselves."  [ECF No. 62-6, PageID.519].  Nor does the Supreme Court; it states that an official need only be *aware* of a substantial risk to prisoner safety and be deliberately indifferent to that risk, to be liable.  *Farmer*, 511 U.S. at 842.  So the Court rejects West's argument that Reedy was required to ask for protection in writing in order to establish the subjective component of the deliberate indifference standard.

Under the Eighth Amendment, West had a duty to take reasonable measures to protect inmates like Reedy from violence from other inmates.  *Farmer*, 511 U.S. at 832-34.  A reasonable jury could find that West fell

14

short of his duty by dismissing the seriousness of Hensley's threats and leaving it to the inmates to figure it out.  [ECF No. 61-2, PageID.407-408, 412].

## B.

West also argues that summary judgment should be granted because he is entitled to qualified immunity.  Qualified immunity shields government officials from civil liability if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Reedy bears the burden of showing that West is not protected by qualified immunity. *Baynes v. Cleland,* 799 F.3d 600, 610 (6th Cir. 2015).  "The issue of qualified immunity may be submitted to a jury only if the legal question of immunity is completely dependent upon which view of the disputed facts is accepted by the jury."  *Id.* (citation, quotation marks and brackets omitted).

West's qualified immunity argument relies entirely on the conclusion that the record does not support a finding that he violated Reedy's Eighth Amendment rights.  [ECF No. 61, PageID.379-380].  The Court has already concluded that there are issues of fact that should be resolved by the jury on the question of whether West violated the Eighth Amendment.  For the same reasons, the question of whether West is entitled to qualified

15

immunity depends completely on which view of the disputed facts the jury accepts.

## IV.   Conclusion

The Court recommends that West's motion for summary judgment **[ECF No. 61]** be denied.


Dated: February 19, 2020                s/Elizabeth A. Stafford
Detroit, Michigan                             ELIZABETH A. STAFFORD
                                                       United States Magistrate Judge


## <u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection

must be served upon this Magistrate Judge.  E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2,"

etc., and **must specify** precisely the provision of this Report and

Recommendation to which it pertains.  Not later than fourteen days after

service of objections, **the non-objecting party must file a response** to

the objections, specifically addressing each issue raised in the objections in

the same order and labeled as "Response to Objection #1," "Response to

Objection #2," etc.  The response must be **concise and proportionate in**

**length and complexity to the objections**, but there is otherwise no page

limitation.  If the Court determines that any objections are without merit, it

may rule without awaiting the response.


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served
upon counsel of record and any unrepresented parties via the Court's ECF
System to their respective email or First Class U.S. mail addresses
disclosed on the Notice of Electronic Filing on February 19, 2020.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager