UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID REEDY,

      Plaintiff,                                              Civil Action No. 16-CV-13876

vs.                                                           HON. BERNARD A. FRIEDMAN

MICHAEL WEST,

      Defendant.
_____/

**<u>OPINION AND ORDER SUSTAINING DEFENDANT'S OBJECTIONS,
REJECTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION,
AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

This matter is presently before the Court on Magistrate Judge Elizabeth A. Stafford's February 19, 2020, Report and Recommendation ("R&R"), in which she recommends that the Court deny defendant's motion for summary judgment. Defendant has filed objections [docket entry 70] to the R&R. Plaintiff has not responded to defendant's objections and the time for him to do so has expired. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall rule on defendant's objections without a hearing. For the following reasons, the Court shall sustain defendant's objections, reject the R&R, and grant defendant's motion for summary judgment.

*Facts*

Plaintiff David Reedy, a prison inmate in the custody of the Michigan Department of Corrections ("MDOC"), was severely injured on July 20, 2016, when his cell-mate, Oscar Hensley, hit him in the head with a softball-sized rock while plaintiff slept in his bunk. Plaintiff believes defendant Michael West, an MDOC counselor[1] in plaintiff's housing unit, is liable because

---

[1] West testified that MDOC prison counselors "take care of paperwork, screening, anything else that needs to be done paperwork-wise for the most part. We do do cell moves if

West knew that Hensley had threatened plaintiff but disregarded plaintiff's and Hensley's requests to reassign plaintiff to a different cell. In his complaint, plaintiff alleges:

> On or about June 18, 2016, I spoke to ARUS Wade[2] about the threats against my life made by my cell-mate. I subsequently made ARUS West [and others] aware of the threats. I was told by ARUS Wade that he would take care of it. Weeks later, after nothing had been done to address the situation, I told ARUS West that I was in fear for my safety due to the threats against my life, and to please move me to another cell. I was told by ARUS West to "deal with it."
> . . .
> On July 19, 2016, my cell-mate told ARUS West that "if y'all don't move this mutherfucker [sic] I'm gonna do what I gotta do!" At this point, I literally begged to be moved for fear that my cell-mate would act on his threats. . . . On July 20, 2016, at about 3:30 a.m., I was attacked by my cell-mate . . . .

Compl. at 3.

When interviewed by the state police on July 23, 2016, plaintiff stated that

> he and OSCAR have been roommates "bunkies" for approximately three to five months. . . . DAVID advised they both (OSCAR and DAVID) went to their counselor to request a room change. I asked DAVID what his reason was to be moved and he stated that they were just too different to live with each other. DAVID stated he overheard the reason OSCAR gave to Mr. West and it was because DAVID slammed the door.

Def.'s Ex. E at 5-6. Hensley told the police that "it was a white/black issue" between him and plaintiff. *Id.* at 2. Plaintiff is African-American; Hensley is Caucasian. He also indicated that when he and plaintiff asked West about "moving rooms," West told them "to work it out." *Id.*

At his deposition, plaintiff testified regarding defendant's knowledge of Hensley's

---

we need to, transfer requests, security classification screens, grievance responses, hearings." Pl.'s Ex. 5 at 8.

[2] Wade, named along with several other prison officials, has been dismissed by stipulation. *See* docket entry 60.

threats:

> Q. Now, can you explain Mr. West's involvement in the – I guess the allegations that make up your complaint?
>
> A. Well, on July 13 I tried to catch Mr. West, he works both sides, he works the level two and level one side of the facility for counselor or ARUS.
>
> Q. So you said you tried to catch him on the 13th. Were you able to catch him that day?
>
> A. I caught him for a brief maybe 60 seconds.
>
> Q. What happened in those 60 seconds?
>
> A. In those 60 seconds I told him that my bunkie had threatened me and we needed to move or can we do something about the situation. And he said I'll get back with you.
>
> Q. Did you tell him how your bunkie threatened you or did you just kind of –
>
> A. No, I didn't.
>
> Q. So you said that Mr. West told you that he'd get back with you?
>
> A. Yes.
>
> Q. Did he ever get back with you?
>
> A. No.
>
> Q. And did you talk to him again after this?
>
> A. Approximately on the day of July 19th, eight a.m.
>
> Q. I know we're getting ahead of ourselves but that's the day before you were attacked; is that correct?
>
> A. Yes.
>
> Q. Okay. So on July 19th, approximately eight a.m. can you explain to me your interaction with Mr. West?

A. Me and my bunkie, Oscar Hensley, approached Mr. West in his office. Oscar Hensley went in first and he was explaining to Mr. West the reason why we need to be separated and moved from one another. Approximately maybe 60 seconds after that Mr. Hensley steps out of the office and Mr. West makes a comment to Mr. Hensley, do what you got to do. Approximately another 30 seconds in between Mr. Hensley stepped back to the front door, leaned his head in and say, do what I got to do? Mr. West say yes. All of a sudden Mr. Hensley takes off.

Q. Now, were you present – you said that Mr. Hensley stepped into Mr. West's office first.

A. Yes.

Q. Were you able to hear the conversation?

A. No.

Q. You said it was approximately 60 seconds?

A. Yes.

Q. And it was only Mr. West and Mr. Hensley in the room at the time?

A. At the time, yes. I was right outside the door.

Q. Now, did you talk to Mr. West at that point in time?

A. At that time, yes, I talked to Mr. West at that time and Mr. West stated to me – he phrased the statement, if he wants to move tell him to come hit me and I'll send him so far up north with paperwork up his. . . .

\* \* \*

Q. Okay. So I guess I'm not perfectly understanding the comment. So did Mr. West instruct Mr. Hensley to hit you, to hit Mr. West? Can you just repeat that one more time for me?

A. No, Mr. West told Mr. Hensley to do what you got to do.

Q. Well, what were you talking about when you referenced I'll send

you so far up north?

A. Mr. West was stating to me for me to go tell Mr. Hensley, if he wants to move –

Q. Mr. Hensley wants to move?

A. If he wants to move come and hit me and I'll have you so far shipped up north with paperwork up your. . . .

Q. Oh, okay. So if Mr. Hensley attacked Mr. West then Hensley would be transferred so far up north?

A. Yes.

\* \* \*

Q. So you talked to Mr. West on the 13th and I believe he told you that he'd get back with you.

A. Yes.

Q. And then on the 18th [sic] Mr. Hensley went in to talk with Mr. West. And then what did you talk – so that's what Mr. West told you when you had a conversation with him?

A. Yes. We both, me and Mr. Hensley, both attended the office and after the conversation with him and Mr. West that Hensley had he told me, he stated to me if Mr. Hensley wants to move tell him to come hit me.

Q. And did you talk about anything else with Mr. West on that date, I think the 19th of July?

A. No. No, that was it right there.

Q. Is that, I guess, the entirety of your communications with Mr. West, then, on the 13th and on the 19th of July?

A. Yes, yes.

\* \* \*

Q. And after Hensley left you said you went in and talked to West, right?

> A. Yes.
>
> Q. And you told West you – did you reiterate your fear for your safety?
>
> A. Yes. And when I did that he – West told me that aww, he ain't going to do nothing. If he wants to do something tell him to come hit me and I will send him so far up north that he have so much paperwork up his. . . .

Pl.'s Dep. at 14-18, 51-52. Plaintiff also testified that he and Hensley had been cell-mates since the previous March and that their relationship "for the most part . . . was good." *Id.* at 27, 48. Plaintiff never made a written request for protection or for transfer to another facility. *Id.* at 39-40.

Defendant testified that plaintiff never previously complained to him about Hensley, and that his only interaction with them occurred the day before the assault:

> Q. And isn't it true that on or around July 19th, 2016, Hensley came to your office to talk to you about transferring either Mr. Hensley or Mr. Reedy out of the cell?
>
> A. The only interaction I ever had with those two was – I couldn't even tell you the date. It might be the date that you're specifying. I'm not sure. Approximately 7:45 in the morning when I first got to my office they were both standing outside my door when I got there and Hensley stated that Reedy needed to get moved out of his cell.
>
> Q. Did he say why?
>
> A. No.
>
> Q. And what happened after that? Did he leave right after you guys talked or how – what was the –
>
> A. No. I sat there and I asked both Mr. Reedy and Hensley at that time how old they were. They stated – Reedy at the time I thought said early 50's, Hensley mid-50's. I said, "You guys are two grown, you know, adults here. You guys should be able to get this figured out." They both left my office. Approximately a half hour later Reedy came down to my office, said they talked and everything was good. That was the only interactions I had with those guys at all 'til

the assault happened at 3:30 in the morning I think is when it was.

\*   \*   \*

A. Hensley was the only one that spoke.

Q. Mr. Reedy said nothing the whole time?

A. Reedy did not say anything. He stood over by where our door is for our caustic room when the whole conversation happened.

Q. So at no time during this conversation did Mr. Hensley say that he has to be moved or he's going to do what he's got to do?

A. He did say that.

Q. What did you mean – what did you think he meant by "do what I gotta do"?

A. People will say anything that they need to to get a cell move. Like I said, they're not on my caseload. I don't know anything about them. And I did let them know at that time also, you know, because he said whatever happens, you know, is going to be onto me and I, of course, had to tell them, "You guys are adults. You know, any actions that you take, that falls upon you for anything that does happen." At that time there, that was all that was said and then they walked away from my door.

Q. And then Mr. Reedy came back on his own?

A. Mr. Reedy came back on his own going out to the yard and said they talked, everything was good.

\*   \*   \*

Q. All right. I just – you know. And can you tell me actually what Hensley told you the day before the assault when he – when he met you outside the office, your office?

\*   \*   \*

A. He came up to me and they're standing out there and he said, "You guys got to move this motherfucker out of my cell."

7

> Q. All right. He said, "Motherfucker out of my cell"?
>
> A. Yes.
>
> Q. Okay. And did you ask him why?
>
> A. At that point there is when I said, "Hold on. You're not going to tell me who I am moving, who I'm not moving." I asked them how old both of them were. I said, "You guys need to be able to figure this out," they left. Reedy came back approximately a half hour later, said they talked and everything was good.
>
> Q. But you never asked him why he had to be moved out of the cell?
>
> A. No.
>
> \* \* \*
>
> Q. And did you ever draw the conclusion in your own mind that Mr. Reedy needed protection and that there was an imminent threat on his life from Mr. Hensley's comments to you?
>
> A. No, I didn't due to Mr. Reedy coming back to . . . my office and stating that they talked and everything was good.

Def.'s Dep. at 15-17, 51, 57. In response to an interrogatory, West indicated that during the July 19 conversation Hensley told West: "If y'all don't move this motherfucker y'all going to be responsible for what happens." Pl.'s Ex. 7.

*Legal Standards*

In a case such as this, where a plaintiff-inmate claims that a defendant-guard has violated his Eighth Amendment right to safety, plaintiff must prove both that his safety was objectively at risk, i.e., that he was "incarcerated under conditions posing a substantial risk of serious harm," *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001), and that defendant was deliberately indifferent to that risk. The Sixth Circuit has summarized plaintiff's burden as follows:

1. The objective component

To establish a constitutional violation based on failure to protect, a prison inmate first must show that the failure to protect from risk of harm is objectively "sufficiently serious." *Id*. [*Farmer v. Brennan*, 555 U.S. 223 (2009)] at 833, 114 S.Ct. 1970 (citation omitted). The inmate must show that "he is incarcerated under conditions posing a substantial risk of serious harm." *Id*.

\* \* \*

2. The subjective component

To establish a constitutional violation based on failure to protect, a plaintiff also must show that prison officials acted with "deliberate indifference" to inmate health or safety. *Id*. at 834, 114 S.Ct. 1970. An official is deliberately indifferent if he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id*. at 837, 114 S.Ct. 1970. The Supreme Court has held that:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Id*. at 842, 114 S.Ct. 1970. However, a prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it. *See id.* at 841-42, 114 S.Ct. 1970.

*Bishop v. Hackel*, 636 F.3d 757, 766-67 (6th Cir. 2011). Plaintiff must show that defendant "actually drew the inference, not just that he should have done so. . . . Deliberate indifference . . . requires the reckless disregard of a substantial risk of serious harm; mere negligence is insufficient." *Mangum v. Repp*, 674 F. App'x 531, 541 (6th Cir. 2017).

***Analysis***

When the evidence in the present case is viewed in the light most favorable to plaintiff, it is apparent that no reasonable jury could find in his favor as to either component of this Eighth Amendment claim.

**A.** *The Risk To Plaintiff's Safety Was Not Sufficiently Objectively Serious*

On this record, there is insufficient evidence from which a jury could find that plaintiff was at substantial risk of serious harm from having to remain in a cell with Hensley. Plaintiff and Hensley had been cell-mates for months and plaintiff testified that their relationship had been "for the most part . . . good" or "neutral." Pl.'s Dep. at 27, 54. This changed in June, approximately one month before Hensley attacked plaintiff, when plaintiff alleges that Hensley first made "threats against my life." Compl. at 3. Plaintiff reported the threats to counselor Wade on June 18. He then waited until July 13 before raising the issue again, apparently this time only with defendant, whom plaintiff told that Hensley had threatened him. Plaintiff did not tell defendant about the nature of threat, and it is not apparent that plaintiff told defendant that Hensley had threatened his life. Pl.'s Dep. at 14-15.

Plaintiff waited another six days before approaching defendant again, this time jointly with Hensley. Plaintiff indicated that when he and Hensley saw defendant on July 19, plaintiff told defendant he feared for his safety. *See* Pl.'s Dep. at 51-52. As noted, defendant acknowledges that at this time Hensley also asked him to move plaintiff to another cell and stated that, "If y'all don't move this motherfucker y'all going to be responsible for what happens." Pl.'s Ex. 7.

Objectively, the record reveals the following facts that are relevant to an assessment of the risk Hensley posed to plaintiff: (1) they shared a cell in peace for at least three months; (2) there is no history of violence between them; (3) there is no indication that Hensley was violent or

10

mentally ill or that plaintiff was unduly vulnerable[3]; (4) plaintiff reported on June 18 (to Wade), July 13 (to defendant), and July 19 (to defendant) that Hensley threatened him; (5) Hensley told defendant on July 19 that he wanted plaintiff moved to another cell because plaintiff slammed the door and that, if plaintiff was not moved, "y'all going to be responsible for what happens"; (6) shortly after Hensley made this statement, plaintiff returned to defendant's office and told defendant that he and Hensley "talked and everything was good"[4]; and (7) before he was attacked by Hensley,

---

[3] Plaintiff argues that Hensley's threats were made objectively more serious by the fact that Hensley is taller and heavier than plaintiff (6'-1" and 198 pounds vs. 5'-8" and 160 pounds) and that Hensley lifts weights. Pl.'s Dep. at 49; *see also* inmates' biographical information available at https://mdocweb.state.mi.us/otis2. Plaintiff suggests that this size differential increased the threat to his safety, but the two inmate-on-inmate-violence cases he cites for this proposition are easily distinguishable. In the first, *Bishop*, *supra*, the aggressor and the sexual assault victim were nearly the same size (5'-9" and 160 pounds vs. 5'-5" and 160 pounds). *See* 636 F.3d at 762. The victim's vulnerability in that case was due instead to the fact that he was young (nineteen years old, while the aggressor was forty-four), "small, apparently mentally 'slow,' and did not have experience in jail." *Id.* at 766. Moreover, the aggressor in *Bishop* was in jail on multiple charges of criminal sexual conduct and was a known predator. *See id.* at 762, 766. In combination, these facts supported the court's conclusion that the risk to plaintiff's safety was "objectively sufficiently serious" for Eighth Amendment purposes. *Id.* at 766. In the other case plaintiff cites for his size-differential argument, *Mangum*, 674 F. App'x at 532-33, the victim was a ninety-six-pound twelve years old who was sexually assaulted at a juvenile detention facility by an eighteen-year old convicted child rapist who had also been disciplined for sexual misconduct while in custody. The facts in the present case bear no resemblance to those of *Bishop* or *Mangum*.

[4] Plaintiff testified that "the entirety" of his conversation with defendant on July 19 occurred when plaintiff and Hensley went to see defendant together. Pl.'s Dep. at 17-18. However, in his summary judgment brief defendant repeatedly cites his testimony that plaintiff *subsequently* told him that he and Hensely "talked and everything was good" to support his argument that he did not believe plaintiff was in danger. *See* Def.'s Br. at 3, 13, 15. Plaintiff makes no mention of this testimony or argument in his response brief. Under Fed. R. Civ. P. 56(e), "[i]f a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for purposes of the motion." Therefore, for purposes of this motion, defendant's testimony on this issue is undisputed. Defendant reiterated, at pages 3 and 7 of his objections, that plaintiff returned and told him that "everything was good," but, as noted, plaintiff has not responded to defendant's objections.

11

plaintiff never made a written request for protection or to be moved.

These facts do not establish that plaintiff was "incarcerated under conditions posing a substantial risk of serious harm." *Curry*, 249 F.3d at 506. In particular, the Court finds it significant that plaintiff and Hensley had no history of altercations of any kind, that there is no evidence Hensley was predatory, and that plaintiff allowed so much time to elapse between his three reports of Hensley's threats (first to Wade on June 18, second to defendant on July 13, third to defendant on July 19), suggesting that plaintiff himself saw no imminent danger in these threats. It is also significant that Hensley told defendant that the source of the friction was plaintiff slamming the door, as this suggests a frivolous dispute and not something over which a threat, even one laced with profanity, would be carried out. Further, approximately thirty minutes after plaintiff and Hensley spoke with plaintiff, plaintiff returned by himself and told defendant that he and Hensley had "talked and everything was good," thereby neutralizing any threat that Hensley's earlier words may have implied. In short, the evidence in this matter could not support a jury finding that Hensley posed an "objectively sufficiently serious" risk to plaintiff's safety. *Bishop*, 636 F.3d at 766.

**B.** *Defendant Was Not Deliberately Indifferent*

Plaintiff has also failed to demonstrate that a jury could reasonably find that defendant was deliberately indifferent to the risk posed to his safety by continuing to house him with Hensley. As noted above, plaintiff must show that defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

First, for the reasons stated above, there was no "excessive" or "obvious" risk to

plaintiff's safety. Plaintiff points to the testimony of officers Lennox, Houser, and Martin, who stated that if an inmate says he fears for his safety, they would separate him pending an investigation into his safety concerns. *See* Pl.'s Exs. 8-10. But the issue it not what other prison officials would do or what prison policy requires (which may be relevant to a negligence claim), but rather whether defendant recklessly disregarded an excessive risk to plaintiff's safety in light of all of the circumstances of this particular case.

Second, it is apparent from defendant's deposition testimony that he did not perceive an excessive risk to plaintiff's safety. Defendant testified that when plaintiff and Hensley came to him on July 19, defendant asked them how old they were, plainly indicating that he believed their dispute to be childish. Plaintiff reported to the state police that he overheard Hensley tell defendant that the basis of the dispute was plaintiff slamming the cell door, which certainly would justify defendant in concluding that the issue was frivolous and in telling them that "[y]ou guys need to be able to figure this out." Def.'s Dep. at 51. A further indication that defendant did not perceive a threat to plaintiff is defendant's "aww, he ain't going to do nothing" comment. Pl.'s Dep. at 52. Defendant testified he dismissed Hensely's threat as a ploy to get himself or plaintiff moved to another cell. Def.'s Dep. at 17, 20. Further, as noted above, approximately thirty minutes after the two met with defendant, plaintiff returned and told defendant that he and Hensley had talked and "everything was good." In short, defendant plainly did not infer that plaintiff faced a substantial risk of harm; nor would the facts of the case permit a jury to find that he was compelled to draw such an inference. *See Farmer*, 511 U.S. at 837.

*Conclusion*

For these reasons, the Court concludes that plaintiff has failed to adduce facts from

which a jury could find in his favor as to either the objective or the subjective component of his Eighth Amendment claim. For the same reasons, defendant is entitled to qualified immunity. While an inmate's "constitutional right to be free from deliberate indifference to assault" is clearly established, *Bishop*, 636 F.3d at 766, no jury could find that a violation of this right occurred in this case. Accordingly,

IT IS ORDERED that defendant's objections to the magistrate judge's R&R are sustained and the R&R is rejected.

IT IS FURTHER ORDERED that defendant's motion for summary judgment is granted.

                                        s/Bernard A. Friedman
                                        BERNARD A. FRIEDMAN
                                        SENIOR UNITED STATES DISTRICT JUDGE

Dated: March 19, 2020
       Detroit, Michigan